## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SAMUEL LEE LOWRY                        )
                                       )          Case No. 2:21-cv-00083
                *Petitioner*,          )
                                       )
           v.                          )
                                       )          Magistrate Judge Kezia O. L. Taylor
ERIC TICE, THE ATTORNEY                )
GENERAL OF THE STATE OF                )
PENNSYLVANIA, and LAWRENCE             )
COUNTY DISTRICT ATTORNEY'S             )
OFFICE,                                )
                                       )
                *Respondents*.         )

### MEMORANDUM OPINION

Presently before the Court[1] is a Petition for Writ of Habeas Corpus ("Petition") filed by

Samuel Lee Lowry ("Petitioner") pursuant to 28 U.S.C. § 2254.  ECF No. 1.  For the reasons set

forth below, the Petition will be denied and a certificate of appealability will also be denied.

### A.  Factual Background and Procedural History

In this habeas case, Petitioner challenges his judgment of sentence entered in the Court of

Common Pleas of Lawrence County at criminal docket number CP-37-CR-0001146-2014.

The relevant factual and evidentiary background, as recited by the trial court, is as follows:

> In early November 2014, [D.P.] was a 27-year-old female tenant of an
> apartment at *** Cuba Street, New Castle, Pennsylvania, which she shared with
> her boyfriend, [T.K.] and their daughter.  N.T., 8/21/18, at 10, 12-13.  On the
> evening of Friday, November 7, 2014, [D.P.] dropped off her daughter at [T.K.'s]

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented
to have a United States Magistrate Judge conduct proceedings in this case, including entry of a
final judgment.

mother's residence in Ohio at approximately 8:30 p.m. *Id*. After returning to the apartment at approximately 9:30 p.m., [D.P.] retired to her second-floor bedroom with [T.K.], where the two engaged in consensual oral sex before going to sleep. *Id*. A few hours later, shortly before 2:00 a.m. on November 8, 2014, [T.K.] woke up and got ready to go to work [for] his 3:00 a.m. to 2:00 p.m. shift as a laborer at Wheatland-American Cap. *Id*. at 87-88. At 2:02 a.m., [T.K.] exited the apartment, entered his vehicle, and drove away to go to work. *Id*. at 134. [D.P.], who slept nude that night as was common for her, remained in bed and asleep for another couple of hours, until she awoke amidst a sensation of dyspnea (difficulty breathing). *Id*. at 15. At this time, as she attempted to remove some blankets to circulate air around her, [D.P.] noticed a male stranger's nude body on top of her. *Id*.

[D.P.] immediately deduced that this unknown man was not [T.K.] because the stranger was licking and kissing her neck and left ear, which were things that [T.K.] never did. *Id*. More troubling, the stranger had [D.P.] pinned down to her bed with his body weight and had the top of his erect penis inserted into her vagina, despite [D.P.] having never provided her consent for this sexual encounter. *Id*. at 25. During his time on top of [D.P.], the man neither fully inserted his penis into her vaginal cavity nor ejaculated. *Id*. All the while, [D.P.], as she struggled to free herself, screamed and yelled at this unknown assailant to get off her and leave the apartment. *Id*. at 16. Eventually, [D.P.] was freed after the intruder rolled over to the other side of [D.P.'s] bed, and he began claiming that the two of them had been engaged in sexual activity throughout the night. *Id*. With the bedroom still dark, [D.P.] continued to order the intruder to leave, got out of bed, and made her way to a closet where she knew [T.K.], an avid hunter and target shooter, kept a loaded shotgun. *Id*. at 17, 96. [D.P.] retrieved the shotgun, sustaining a bruise in the process, but did not fire it at the intruder. *Id*. When the lights came on, [D.P.] instantly recognized the intruder as "Duke," a nickname for [Appellant] well known to both [D.P.] and the New Castle Police Department ("NCPD"). *Id*. at 20, 103.

[Petitioner] then left the bedroom, went downstairs, and fled [D.P.'s] apartment through the back door. Meanwhile, [D.P.] quickly dressed herself and dialed 911, a call that records indicate was first received by the NCPD at 4:28 a.m. on November 8, 2014. The first officer to respond on the scene was then-Patrol Officer, now-Detective Brandon Hallowich of the NCPD, who arrived at 4:35 a.m. *Id*. at 102. After arriving at the apartment, Detective Hallowich met with a shaken and rattled [D.P.], and discussed with her the events that had recently transpired upstairs. *Id*. at 102. Detective Hallowich also observed the apartment's back door ajar, despite [D.P.'s] statements that she had locked the back door earlier that night, and concluded that [Petitioner] had fled the scene through that door. *Id*. at 104. For this reason, Detective Hallowich advised other NCPD officers via radio to be on the lookout for [Petitioner] in a southwesterly direction from the crime scene. *Id*.

[D.P.] was then taken to Jameson Hospital by ambulance along with Detective Hallowich to complete a sexual assault examination kit. *Id*. at 106. The samples collected as part of this examination included a vaginal swab, a neck swab, and a swatch of [D.P.'s] underwear. *Id*. at 108. These samples were eventually transmitted to the Pennsylvania State Police ("PSP") Crime Lab in Greensburg, Pennsylvania, for DNA analysis. *Id*. at 107. Likewise, buccal swab samples of DNA were later collected and sent to the PSP Crime Lab from [D.P.], [T.K.], and [Petitioner]. [D.P.] eventually returned home later that morning and phoned [T.K.] to inform him of what had happened. *Id*. at 92.

Meanwhile in the early morning of November 8, 2014, Detective Fred Buswell, also then a patrol officer for the NCPD, received the radio message about [Petitioner's] escape route from [D.P.'s] apartment and shortly thereafter located [Petitioner] on the back porch of an apartment at *** Halco Drive, New Castle, Pennsylvania, approximately one quarter-mile away from [D.P.'s] apartment. *Id*. at 158. Detective Buswell approached [Petitioner], who appeared to be intoxicated, and questioned him as to his whereabouts earlier that night. *Id*. [Petitioner], who exhibited a cooperative demeanor, claimed that he had been at *** Halco Drive all evening, an alibi that Detective Buswell immediately disbelieved when he observed that no lights were on at that apartment and that [Petitioner's] shoes appeared to be wet from recently walking across the dewy early morning grass. *Id*. Detective Buswell then took [Petitioner] into custody as a suspect in the crimes that had occurred at [D.P.'s] apartment. *Id*. In the course of frisking [Petitioner] as part of the search incident to arrest, Detective Buswell felt [Petitioner's] erect penis, and then transported [Petitioner] to the NCPD station for processing. *Id*. at 159. Detective Hallowich, who heard that [Petitioner] had been taken into custody, also returned to the NCPD station and later recalled seeing surveillance footage that [Petitioner] was masturbating that night while in the station's holding cell. *Id*. at 110. No police officers took a statement from [Petitioner] that morning, Detective Hallowich explained, because he was thought to be intoxicated from alcohol or some unknown substance. *Id*. at 151. Following the events of November 8, 2014, [Petitioner] was subsequently charged through the aforementioned information.

In her testimony at trial, [D.P.] provided additional context and background on her previous encounters with [Petitioner]. [D.P.] knew [Petitioner] prior to November 8, 2014, primarily due to [Petitioner's] father renting a nearby apartment at *** Cuba Street. *Id*. at 26. [D.P.] explained that she and [Petitioner] did not speak often and that when they did, the conversation rarely extended beyond a simple exchange of pleasantries. *Id*. at 27. Among the only extended interactions with [Petitioner] that [D.P.] could recall was one rainy night some months prior to November 8, 2014, when she permitted [Petitioner], who had knocked on her apartment's front door at 4:30 a.m., to sleep on her downstairs couch for a few hours until his father returned to his nearby apartment. *Id*. at 28. Even during this

brief stay, [Petitioner] displayed alarming behavior when he attempted to make his way upstairs, ostensibly to use the restroom despite the presence of a bathroom on the first floor, and made [D.P.] immediately uncomfortable. *Id.*

[Petitioner's] troubling behavior manifested on another occasion at the apartment when [D.P.] and [T.K.] were present, as [Petitioner], unannounced and uninvited, walked into the apartment and inquired about borrowing a cell phone. *Id.* at 66. After the incident on November 8, 2014, [D.P.] noted she endured a general harassment from her neighbors, supposedly for "snitching" on [Petitioner], which years later evolved into patently false rumors that she had been having an affair with [Petitioner] at the time of the incident. *Id.* at 29, 54-56, 70. Summarizing her pre-incident relationship with [Petitioner], [D.P.] explained that, notwithstanding her charitable decision to provide him with a dry place to sleep on one isolated occasion, [Petitioner] was at most a neighborhood acquaintance who at no time had any license or standing permission to enter her apartment and who at no time was her consensual sexual partner. *Id.* at 67, 74. By contrast, [D.P.] testified that her most recent consensual vaginal sexual intercourse had taken place with [T.K.] on November 5, 2014. *Id.* at 64-65.

Besides [D.P.'s] eyewitness accounts of the events of November 8, 2014, Detective Hallowich testified at trial regarding footage, also admitted into evidence, from several surveillance cameras in the neighborhood surrounding [D.P.'s] apartment that recorded [Petitioner's] movements in those early morning hours. Specifically, Detective Hallowich narrated clips that showed a young man who was wearing the same clothes later collected from [Petitioner] after his arrest leave the apartment at *** Cuba Street at approximately 3:59 a.m., spend several minutes wandering around the neighborhood, and then walk up to [D.P.'s] apartment at *** Cuba Street and enter through an apparently unlocked front door before briefly toggling the switch for the apartment's front porch light. *Id.* at 136. Those same surveillance cameras had captured [T.K.] leaving the apartment as he left for work approximately two hours earlier. *Id.* at 133. Detective Hallowich explained that investigators at the crime scene found no sign of [Petitioner] making a forced entry through the front door of [D.P.'s] apartment. *Id.* at 141. It appears that neither [D.P.] nor [T.K.] locked the apartment's front door that night because [D.P.] expected [T.K.] to do so as he left for work and [T.K.], who was running late that morning, may have absentmindedly forgotten to perform that task. *Id.* at 27, 96.

By November 2015, the DNA samples had been analyzed by the PSP Crime Lab, and the results synthesized into a published report that was eventually admitted as evidence at trial. At trial, the Commonwealth called Julia Garofalo ("Garofalo"), the forensic DNA supervisor at the PSP Crime Lab in Greensburg and the author of the DNA report. Garofalo, possessor of a master's degree in forensic science and an employee of the PSP since August 2012, was certified as an expert witness

4

in DNA analysis. N.T., 8/22/18, at 13. Garofalo explained that her PSP lab, which is fully accredited and audited against FBI and PSP quality assurance standards, utilizes the standard DNA test known as short tandem repeat ("STR") that looks at 24 very specific areas on different chromosomes and evaluates the presence of a person's DNA by seeing how many repeats of a certain genetic sequence a person has at those 24 locations. *Id*. at 17-18. Garofalo described the testing process as a comparison of the repeats in question samples (e.g. those taken from a crime scene) versus those from a known sample. *Id*. at 19. The goal of DNA analysis, Garofalo noted, is not to say definitively that a sexual assault occurred but rather that DNA was found at a certain place and time. *Id*. at 20. The results of these tests are expressed in the statistical terms of chances of finding identical DNA elsewhere in a given population. *Id*. at 23.

The question samples in this case were taken from the sexual assault examination kit performed in the early morning of November 8, 2014. Sample Q1 was from the vaginal swab, sample Q2 was a swab of [D.P.'s] neck, and sample Q3 was a swatch of [D.P.'s] underwear. Sample K1 was a buccal swab of [D.P.'s] DNA, sample K2 was a buccal swab of [Petitioner's] DNA, and sample K3 was a buccal swab of [T.K.'s] DNA. Because samples Q1 and Q3 were determined to have a presence of sperm DNA, those samples were further divided into sperm and nonsperm portions, as is standard procedure. *Id*. at 29. For sample Q1, the major contributor to the sperm portion was matched to [T.K.], and the chances of this DNA sample of having come from another person were described as 1 in 940 octillion in the Caucasian population, 1 in 51 nonillion in the black population, and 1 in 110 octillion in the Hispanic population. *Id*. at 37. The major contributors to the non-sperm portions of sample Q1 were determined to be [D.P.] and a third, unknown individual. *Id*. at 39. For sample Q2, the two major contributors were determined to be [D.P.] and [Petitioner], and Garofalo stated that it was 1.8 decillion times more likely in the Caucasian population, 14 nonillion times more likely in the black population, and 2.6 decillion times more likely that these two individuals contributed to the DNA to this mixture than two unknown individuals. *Id*. at 40. Trace amounts were also found from an unknown third person.

Lastly, for sample Q3, the results of the sperm portion showed a mixture of DNA from [T.K.] and [Petitioner] that was 160 trillion times more likely in the Caucasian population, 470 billion times more likely in the black population, and 13 trillion times more likely in the Hispanic population to have come from those two individuals than two unknown persons. *Id*. at 43. While these statistical probabilities, the result of only having enough DNA to test six loci instead of the usual 24, were much lower than figures given for the vaginal and neck samples, Garofalo nonetheless noted that it was "still many times more likely that these two individuals contributed DNA as opposed to two unknown individuals in the population." *Id*. at 44. For the non-sperm portion of sample Q3, it was determined

5

that [D.P.] and [T.K.] were the primary contributors. *Id*. at 48.  Importantly, with respect to sample Q2, Garofalo conceded the minute possibility that [Petitioner's] DNA could have ended up on [D.P.'s] neck through transferred contact from other surfaces, but stated the presumption that his DNA ended up there through his saliva. *Id*. at 64.  In concluding her testimony, Garofalo stood by her analysis and reiterated that her results were derived from approved scientific methodology. *Id*. at 56, 58.  At the end of Garofalo's testimony, the Commonwealth rested its case-in-chief.

In rebuttal, [Petitioner's] case-in-chief consisted exclusively of the testimony of Dr. James Girard, a Professor of Chemistry at American University in Washington, D.C.  Testifying via Skype, Dr. Girard was certified as an expert witness in the field of DNA analysis. *Id*. at 92.  With respect to Garofalo's report, which he had extensively reviewed before trial, Dr. Girard stated his general agreement with the results as pertaining to samples Q1 and Q2. *Id*. at 97, 111.  The only area in which Dr. Girard expressed disagreement with Garofalo was with the conclusions on Q3, for which he felt that Garofalo "overstated the certainty" of the findings. *Id*. at 100, 116.  Dr. Girard's conclusion was that [Petitioner's] connection to the sperm portion of sample Q3 was much weaker than [T.K.], even though he admitted that he agreed with Garofalo's report as it pertained to four of the six loci tested on that portion. *Id*. at 101, 112.  Dr. Girard also found fault with the failure of the PSP to run a Y Chromosome Test on the samples, despite such a test being standard protocol in rape cases. *Id*. at 105.  At the conclusion of Dr. Girard's testimony, [Petitioner] rested his case.

ECF No. 12-15 at 101-09.

Petitioner's trial commenced on August 21, 2018, and the case went to the jury for deliberation on August 23, 2018.  *See* ECF Nos. 12-2 – 12-9.  Based on the evidence presented, the jury found Petitioner guilty on the charges of rape of an unconscious victim, sexual assault, and indecent assault of an unconscious victim.  *See* ECF No. 12-9 at 77-78.  The jury acquitted Petitioner on the charge of burglary of an overnight accommodation with a person present.  *Id*.  On October 31, 2018, Petitioner was sentenced to an aggregate of eight-and-a-half years to twenty years of incarceration.  ECF No. 12-10.  He filed timely, counseled post-sentence motions, ECF No. 12-11, which were denied by operation of law on March 1, 2019.  The trial court later set forth an opinion and order on the motions on March 20, 2019.  ECF No. 12-12.

On March 26, 2019, Petitioner filed a timely, counseled appeal, which the Superior Court of Pennsylvania quashed for counsel's failure to include only the lower court docket number on the notice of appeal.[2]  ECF No. 12-14.  On September 20, 2019, Petitioner filed in the trial court a timely, counseled petition pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA") seeking the restoration of his direct appeal rights due to counsel's ineffectiveness.  The court reinstated Petitioner's direct appeal rights by order dated October 15, 2019, and Petitioner subsequently filed another direct appeal *nunc pro tunc*.  ECF No. 12-13.  The Superior Court affirmed Petitioner's judgment of sentence in a Memorandum Opinion filed on March 27, 2020. ECF No. 12-18.  Petitioner then filed a petition for allowance of appeal, which the Supreme Court of Pennsylvania denied on September 1, 2020.  ECF No. 12-19.

According to Petitioner's state court docket, he filed a second PCRA petition in the trial court on or about October 15, 2020.[3]  He was appointed new counsel to represent him in that matter, and through counsel, the PCRA petition was voluntarily dismissed on February 2, 2021.

Petitioner initiated these federal habeas proceedings by submitting his Petition to this Court on January 13, 2021.  ECF No. 1.  The four grounds for relief raised in the Petition, as set forth by Petitioner, are as follows:

---

[2] In its order, the Superior Court stated that Petitioner had failed to comply with the mandate of *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018), because he filed a single notice of appeal listing multiple docket numbers, whereas the correct procedure would have been to file a separate notice of appeal at each docket number.

[3] Respondents did not submit to the Court a copy of this petition, or any other state court pleading that was subsequently filed by Petitioner after the Supreme Court of Pennsylvania denied his petition for allowance of appeal.  Nonetheless, the Court takes judicial notice of the pleadings listed on Petitioner's state court docket, which is a matter of public record.

1. "Based on the foregoing, inter alia, the supreme court committed an error by not intervening upon a review of the trial records and recognizing the factual events which led to defendant['s] conviction as testified to by commonwealth's witnesses did not make sense and created reasonable doubt."

2. "Instantly there was insufficient evidence presented by the commonwealth and the witnesses from which the jury could of concluded beyond a reasonable doubt about 11/8/14."

3. "In looking at all the foregoing, the supreme court errored in not properly analyzing the entire record in this matter, especially in light of the inconsistent verdict."

4. "When a review of the record reveals conviction based on the evidence built on a foundation of reasonable doubt, surmise, and conjecture."

ECF No. 1 at 20.

A liberal reading of the Petition would suggest that Petitioner is ultimately claiming that the evidence was insufficient to sustain his convictions and that the jury's verdict was against the weight of the evidence. Indeed, these were the only two claims that Petitioner raised on direct appeal and that would withstand 28 U.S.C. § 2254(b)'s exhaustion requirement. *See O'Sullivan v. Boerckel*, 562 U.S. 838, 845 (1999) (The exhaustion requirement "is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal court[.]"). Notwithstanding Respondents position that both claims should be dismissed because Petitioner failed to exhaust the factual basis for each, *see* ECF No. 12-1 at 11, the Court finds that the substance of both were fairly presented to the state courts and that the state courts had the opportunity to apply controlling legal principles to the facts despite what now appears to be variations in the factual support for each. *See Picard v. Connor*, 404 U.S. 270, 277 (1971) (recognizing with regard to the exhaustion doctrine that "there are instances in which 'the ultimate question for disposition,' . . . will be the same despite variations in the legal theory or

factual allegations urged in its support.").  Accordingly, the Court will proceed as if Petitioner is raising claims that the Superior Court erred in denying both his challenges to the sufficiency and weight of the evidence.

**B.  Federal Habeas Standard**

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, April 24, 1996 ("AEDPA"), habeas relief is only available for "a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

An application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  For purposes of § 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when the state court made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground.  *See*, *e.g.*, *Harrington v. Richter*, 562 U.S. 86, 98-100 (2011); *Robinson v. Beard*, 762 F.3d 316, 324 (3d Cir. 2014).

The majority of federal habeas claims need only be analyzed under § 2254(d)(1), which applies to questions of law and mixed questions of law and fact.  In applying § 2254(d)(1), the federal habeas court's first task is to ascertain what law falls within the scope of the "clearly

established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1).  The phrase "clearly established," as the term is used in § 2254(d)(1), "refers to the holdings, as opposed to the dicta, of the [United States Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 363, 412 (2000).  Thus, "clearly established Federal law" is restricted to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

Once the "clearly established Federal law, as determined by the Supreme Court of the United States" is ascertained, the federal habeas court must determine whether the state court's adjudication of the claim at issue was "contrary to" that law.  *Williams*, 529 U.S. at 404-05 (explaining that the "contrary to" and "unreasonable application of" clauses of § 2254(d)(1) have independent meaning).  A state-court adjudication is "contrary to" clearly established Federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Id.* at 405, 406.  A "run-of-the-mill" state-court adjudication applying the correct legal rule from Supreme Court decisions to the facts of a particular case will not be "contrary to" Supreme Court precedent.  *Id.* at 406.  Thus, the issue in most federal habeas cases is whether the adjudication by the state court survives under § 2254(d)(1)'s "unreasonable application" clause.

A state court decision is an "unreasonable application" of clearly established Federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*,

529 U.S. at 413.  To satisfy his burden under this provision of AEDPA's standard of review, the petitioner must do more than convince the federal habeas court that the state court's decision was incorrect.  He must show that it "was objectively unreasonable."  *Id*. at 409.  This means that the petitioner must prove that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, 562 U.S. at 103.

As the Supreme Court has noted:

> ….  It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.  *See Lockyer*, *supra*, at 75, 123 S. Ct. 1166.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin*, 518 U.S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no further.

*Richter*, 562 U.S. at 102.

If a petitioner is able to satisfy the requirements of § 2254(d)(1), then the state court decision is not entitled to deference under AEDPA and the federal habeas court proceeds to a de novo evaluation of the constitutional claim on the merits.  *See Tucker v. Superintendent Graterford SCI*, 677 F. App'x 768, 776 (3d Cir. 2017) (citing *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("When . . . the requirement set forth in § 2254(d)(1) is satisfied[,] [a] federal court must then resolve the claim without the deference AEDPA otherwise requires.").  The Court of Appeals for the Third Circuit has explained that,

> [w]hile a determination that a state court's analysis is contrary to or an unreasonable application of clearly established federal law is necessary to grant habeas relief, it is not alone sufficient.  That is because, despite applying an improper analysis, the state court still may have reached the correct result, and a federal court can only grant the Great Writ if it is "firmly convinced that a federal constitutional right has been violated," *Williams*, 529 U.S. at 389, 120 S.Ct. 1495.  *See also Horn v. Banks*, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) ("[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review . . . none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard").  Thus, when a federal court reviewing a habeas petition concludes that the state court analyzed the petitioner's claim in a manner that contravenes clearly established federal law, it then must proceed to review the merits of the claim de novo to evaluate if a constitutional violation occurred.  *See Lafler v. Cooper*, 566 U.S. 156, 174, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012).

*Vickers v. Superintendent Graterford SCI*, 858 F.3d 841, 848-89 (3d Cir. 2017) (internal footnote omitted).

The standard of review set forth at § 2254(d)(2) applies when a petitioner "challenges the factual basis for" the state court's "decision rejecting a claim[.]"  *Burt v. Titlow*, 571 U.S. 12, 18 (2013).  "[A] state court decision is based on an 'unreasonable determination of the facts' if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding,' which requires review of whether there was sufficient evidence to support the state court's factual findings."  *Dennis v. Secretary, Pennsylvania Department of Corrections*, 834 F.3d 263, 281 (3d Cir. 2016) (quoting § 2254(d)(2) and citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).  "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'"  *Titlow*, 571 U.S. at 18 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)); *see Rice v. Collins*, 546 U.S. 333, 342 (2006) (reversing court of appeals' decision because "[t]he panel majority's attempt to use a set of debatable inferences to set aside the conclusion reached by the state court does not satisfy

AEDPA's requirements for granting a writ of habeas corpus."). Thus, "if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede'" the state court's adjudication. *Woods*, 558 U.S. at 301 (quoting *Collins*, 546 U.S. at 341-42).

If the state court did not adjudicate a claim on the merits, the federal habeas court must determine whether that was because the petitioner procedurally defaulted it. *See*, *e.g.*, *Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d Cir. 2002). If the claim is not defaulted, or if the petitioner has established grounds to excuse his default, the standard of review at § 2254(d) does not apply and the habeas court reviews the claim de novo. *See*, *e.g.*, *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). However, in all cases and regardless of whether the standard of review at § 2254(d) applies, the state court's factual determinations are presumed to be correct under § 2254(e)(1) unless the petitioner rebuts that presumption by clear and convincing evidence. *Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010); *Nara v. Frank*, 488 F.3d 187, 201 (3d Cir. 2007) ("the § 2254(e)(1) presumption of correctness applies regardless of whether there has been an 'adjudication on the merits' for purposes of § 2254(d).") (citing *Appel*, 250 F.3d at 210).

**C.  Discussion**

**1.  Sufficiency of the evidence**

When a petitioner alleges entitlement to habeas relief by challenging the sufficiency of the evidence supporting his state court conviction, as Petitioner does here, the clearly established federal law governing the insufficient evidence claim is the standard set out by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See*, *e.g.*, *Eley v. Erickson*, 712 F.3d 837, 847 ("The clearly established federal law governing Eley's [insufficient evidence] claim was determined in

*Jackson*[.]"). Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)).

The reasonable doubt standard of proof requires the finder of fact "to reach a subjective state of *near certitude* of the guilt of the accused." *Id.* at 315 (citing *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)) (emph. added). It "'plays a vital role in the American scheme of criminal procedure,' because it operates to give 'concrete substance' to the presumption of innocence to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding." *Id.* (quoting *Winship*, 397 U.S. at 363). A conviction that fails to satisfy the *Jackson* standard violates due process, *see Jackson*, 443 U.S. at 319, and thus a convicted habeas petitioner is entitled to relief if the state court's adjudication denying the insufficient evidence claim was objectively unreasonable, *see Parker v. Matthews*, 567 U.S. 37, 43 (2012).

In this case, Petitioner was convicted of violating the following Pennsylvania criminal statutes: rape of an unconscious victim, 18 Pa. C.S.A. § 3121(a)(3); sexual assault, 18 Pa. C.S.A. § 3124.1; and indecent assault of an unconscious victim, 18 Pa. C.S.A. § 3126(a)(4). On direct appeal, Petitioner alleged that the evidence was insufficient to sustain his convictions and specifically argued that the evidence did not support the fact that D.P. was unconscious when the sexual activities between her and Petitioner occurred, that D.P. was an unwilling participant in the sexual activity, or that D.P. was unaware the sexual activity was occurring. *See* ECF No. 12-18 at 9. The Superior Court concluded that the evidence, when viewed in the light most favorable to

the Commonwealth, as verdict winner, was sufficient to enable the jury to find every element of the crimes beyond a reasonable doubt. *Id*. at 12.

This Court's first inquiry is to ask whether the Superior Court's denial of Petitioner's sufficiency of the evidence claim resulted in a decision contrary to *Jackson*. Here, there is no question that the Superior Court applied Pennsylvania's equivalent of the Supreme Court's *Jackson* standard to Petitioner's sufficiency of the evidence claim, *see* ECF No. 12-18 at 9-10 (citing *Commonwealth v. Graham*, 81 A.3d 137, 142 (Pa. Super. 2013), and therefore its decision was not contrary to clearly established Federal law. *See Eley*, 712 F.3d at 848 (holding that Pennsylvania's test for insufficient evidence "[do]es not contradict *Jackson*"); *Evans v. Ct. of Common Pleas, Del. Cty*., 959 F.2d 1227, 1233 (3d Cir. 1992) ("the test for insufficiency of the evidence is the same under both Pennsylvania and federal law"). As a result, the Superior Court's adjudication satisfies review under the first clause of 28 U.S.C. § 2254(d)(1).

The next question before this Court is whether the adjudication of this claim was an unreasonable application of *Jackson* or an unreasonable determination of the facts in light of the evidence presented. In other words, because the Superior Court found that there was sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Petitioner had engaged in sexual intercourse with D.P. while she was asleep on November 8, 2014, this Court must ask whether that decision was objectively unreasonable.

The Superior Court set forth a thorough analysis of the evidence in Petitioner's case and concluded that, when viewed in the light most favorable to the Commonwealth, it was sufficient to enable the jury to find every element of the crimes beyond a reasonable doubt. In support of its finding, it heavily relied on the following portion of the trial court's opinion:

[T]he Commonwealth's evidence established that [Petitioner] engaged in sexual intercourse with [D.P.]. In her testimony, [D.P.] recalled waking up with the tip of [Petitioner's] penis inside of her vagina. This provided evidence of "penetration, however, slight," and established the element of sexual intercourse. [*See Commonwealth v. Wall*, 953 A.2d 581, 584 (Pa. Super. 2008) (holding the element of sexual intercourse is established entirely by evidence of penile penetration, "however slight," of the victim's vagina).] [D.P.] further testified that she had been asleep for some time prior to waking up with [Petitioner] on top of her, which established the element[s] of unconsciousness[, as well as lack of consent and lack of awareness]. Thus, [D.P.'s] testimony alone established the critical elements of rape of an unconscious victim, [as well as sexual assault and indecent assault,] and was sufficient by itself to sustain [Petitioner's] conviction[s.] [*See*] *Commonwealth v. Gabrielson*, 536 A.2d 401, 409 (Pa. Super. 19888) ("[The] uncorroborated testimony of a rape victim, if believed by a jury, is sufficient to support a rape conviction.").

Moreover, the Commonwealth's additional evidence supplements [D.P.'s] testimony and solidly establishes the identity of [Petitioner] as the perpetrator of the crimes. Detective Hallowich narrated the surveillance footage of [D.P.'s] apartment that showed [Petitioner] entering her home at approximately 4:00 a.m. on November 8, 2014; sample Q2 of the DNA evidence buttressed [D.P.'s] testimony that she awoke to [Petitioner] licking her neck. Detective Buswell's testimony noted that [Petitioner] still had an erect penis at the time of his arrest, a physical state consistent with a man interrupted at the beginning of sexual intercourse.

ECF No. 12-18 at 11 (citing Trial Court Opinion, filed 12/5/19, at 28-29).

The Superior Court also addressed Petitioner's additional argument that D.P.'s testimony was so unreliable and contradictory that the entire verdict was based on no more than surmise or conjecture and found as follows:

We conclude the jury was free to weigh these facts in determining D.P.'s credibility. This is not a case, . . ., in which the Commonwealth's case was based upon the testimony of a witness whose credibility was so inconsistent and to be completely irreconcilable, and the finder of fact would have had to guess which version of the story to believe.

Further, contrary to [Petitioner's] suggestion . . . any case involving allegedly contradictory or inconsistent testimony [does not require] consideration (let along reversal) on sufficiency grounds. Simply put, the evidence in this case

was not so patently unreliable that the jury was forced to engage in surmise and conjecture in arriving at a verdict based on that evidence. [FN5]

> FN5   We note that, in developing his sufficiency of the evidence claim, [Petitioner] cites extensively to the testimony presented by his DNA expert, Dr. Girard, and concludes Dr. Girard's testimony called into doubt whether the DNA evidence supported D.P.'s testimony.  However, even if [Petitioner's] argument is accurate in this regard, as indicated above, the jury was free to weigh this testimony and believe all, part, or none of Dr. Girard's testimony. Simply put, the evidence is not rendered insufficient because the jury rejected some or all portions of Dr. Girard's testimony.

Further, as it pertains to [Petitioner's] sufficiency of the evidence claim, [Petitioner] contends the jury's verdict convicting him of the three sex-based crimes is inconsistent with the jury's verdict acquitting him on the charge of burglary of an overnight accommodation with a person present under 18 Pa. C.S.A. § 3502(a)(1).  [Petitioner] posits that the inconsistent guilty verdicts cannot stand since "[i]f [Petitioner] did not unlawfully enter [D.P.'s] apartment on the evening of November 8, 2014, and with no intent to commit a crime, how then can we know for sure what transpired therein on the evening in question between [Petitioner] and [D.P.] beyond a reasonable doubt?"  [Petitioner's] issue presents a question of law, to which we apply a *de novo* standard of review.  *Commonwealth v. Moore*, 103 A.3d 1240, 1244 (Pa. 2014).

"[A] defendant may not challenge his conviction on one count when it is inconsistent with the jury's verdict of acquittal on another count."  *Moore*, *supra*, 103 A.3d at 1246.  This is because, in such a case, although a jury conviction establishes that the jury found each element of a crime beyond a reasonable doubt, no such factual inference can be made by a jury's acquittal.  *See id*. (affirming conviction of possessing instrument of crime despite jury's acquittal of murder following self-defense claim).

Thus, in the case *sub judice*, we cannot infer from the jury's acquittal on the charge of burglary of an overnight accommodation with a person present that the evidence at [Petitioner's] trial failed to meet any element of that offense, or allow such an inference to undermine the jury's conclusion that the evidence **did** meet each element of rape of an unconscious victim, sexual assault, or indecent assault of an unconscious victim.  [FN6]  Thus, we find no merit to this claim.

> FN6   As indicated *supra*, the evidence was sufficient to sustain [Petitioner's] convictions for rape of an unconscious victim, sexual assault, and indecent assault of an unconscious victim.

17

ECF No. 12-18 at 12-15 (internal citations to the record omitted).

Petitioner has not demonstrated that the Superior Court's decision was objectively unreasonable.  Based on the evidence adduced at trial, a reasonable jury could have certainly found that Petitioner engaged in sexual intercourse with D.P. as she was asleep.  Her testimony that she woke up to Petitioner on top of her with his penis penetrating her vagina was sufficient evidence for a jury to convict Petitioner of the three sex-based offenses.  For these reasons, the Court finds that the Superior Court's adjudication of the sufficiency of the evidence challenge was not an unreasonable application of clearly established Federal law, nor was the Superior Court's decision based on an unreasonable determination of the facts in light of the evidence presented.  As a result, the Superior Court's adjudication satisfies review under the second clause of 28 U.S.C. § 2254(d)(1).

### 2.  Weight of the evidence

Petitioner also raises a claim that the jury's verdict was against the weight of the evidence. In his appeal before the Superior Court, he specifically argued that "the conflicts in the DNA evidence presented by the Commonwealth's expert and the defense's expert, particularly when weighed against the 'incredulous testimony' of D.P., renders the jury's verdict against the weight of the evidence."  ECF No. 12-18 at 15.  The Superior Court considered the claim and ultimately determined that it was insufficient to warrant Petitioner a new trial under Pennsylvania law.  *Id*. at 15-17.

Petitioner's claim that the jury's verdict was against the weight of the evidence is purely one of state law that is distinct from a federal due process claim.  *Tibbs v. Florida*, 457 U.S. 31,

whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*

Applying this standard here, Petitioner has not made the requisite showing. Accordingly, the Court will not issue a certificate of appealability on any of Petitioner's claims. An appropriate Order will be entered.

Dated: February 15, 2024.

<u>s/Kezia O. L. Taylor</u>
KEZIA O. L. TAYLOR
United States Magistrate Judge

Cc:     Samuel Lee Lowry
        NQ6498
        SCI Mahanoy
        301 Grey Line Drive
        Frackville, PA 17931

        Counsel for Respondents
        (*via CM/ECF electronic mail*)